Jess M. Krannich (Utah Bar No. 14398)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, UT 84111-1180
Tel: (801) 303-0034
Fax: (801) 364-5678
jkrannich@mc2b.com

Gabriel E. Bedoya (*Pro Hac Vice*)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Tel: (313) 465-7254
gbedoya@honigman.com

*Attorneys for Plaintiff AAAG-California, LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AAAG-CALIFORNIA, LCC,<br><br>Plaintiff,<br><br>v.<br><br>ABDUL R. KISANA; JACK METCALF; SPECIALIZED SALES AND LEASING, LLC; and LUXURY AUTO GROUP, LLC,<br><br>Defendants. | **FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>Civil No. 2:20-cv-00026-HCN<br><br>Judge Howard C. Nielson, Jr. |

Plaintiff AAAG-California, LLC ("AAAG" or "Plaintiff"), through its undersigned counsel of record, hereby brings its First Amended Complaint and Jury Demand against Defendants Abdul R. Kisana ("Kisana"), Jack Metcalf ("Metcalf"), Specialized Sales and Leasing, LLC ("Specialized Leasing"), and Luxury Auto Group, LLC ("Luxury Auto") (collectively "Defendants") and alleges and states as follows:

## **INTRODUCTION**

1.     Plaintiff AAAG runs an auto auction company in Southern California, selling used luxury vehicles to auto dealers headquartered throughout the country.

2.     AAAG also provides a venue for sellers to auction their vehicles.

3.     Although AAAG may pay the seller for the vehicle to be auctioned, the vehicle's title is only transferred to the auction's buyer upon AAAG's receipt of payment from the buyer.

4.     Depending on the frequency and magnitude with which an auto dealer purchases vehicles at AAAG's auctions, AAAG provides certain dealers the privilege to process their payments with greater flexibility.

5.     Yet, regardless of the buyer's payment term, AAAG never provides the auction's buyer with the vehicle's title until the buyer has processed the full payment to AAAG.

6.     Defendant Kisana has been purchasing vehicles from AAAG since 2018.

7.     Based on the frequency and magnitude of Kisana's purchases, Kisana was granted status as a "privileged" dealer, who was afforded greater flexibility in paying for the vehicles Kisana purchased at auction.

8.     Although at times AAAG suspended Kisana from making additional purchases until he paid for all vehicles he had agreed to purchase, in full, Kisana had always satisfied his obligations to AAAG and accordingly remained a privileged dealer.

9.     Still, AAAG never once provided Kisana with titles to the vehicles purchased until Kisana had processed the full payment to AAAG.

10.     At the end of 2019, Kisana radically altered his behavior as a privileged dealer, when he refused to pay the $2 million balance he had outstanding following his agreement to purchase approximately 58 vehicles at AAAG's auctions.

11.     Instead, Kisana misrepresented his ability to pay the outstanding sum, defrauding AAAG into granting Kisana possession of 58 vehicles, while Kisana then failed to pay the amount that he contractually owed.

12.     At the end of December 2019, AAAG determined that Kisana had relied on the assistance of a now-former employee at AAAG, who shipped the titles of the vehicles to Kisana's dealership in Salt Lake City, Utah—without the knowledge or authorization of AAAG.

13.     Kisana and, upon information and belief, his agent Defendant Jack Metcalf, were aware that title was sent to Specialized Leasing, without AAAG's approval.   Indeed, upon information and belief, Kisana and Metcalf knew that payment had yet to be processed for the vehicles when Defendants improperly obtained the titles to those vehicles.

14.     Nevertheless, in wrongful possession of the vehicles and their titles, Defendants converted AAAG's property, retailing some of the vehicles to consumers throughout the country.

15.     Although originally in possession of 58 of AAAG's vehicles as of December 2019, Defendants have since returned fifteen vehicles to AAAG in December 2019 and January 2020, including five returned only after Plaintiff had initiated this litigation.

16.     Defendants have nevertheless refused to return and/or pay for 43 vehicles taken from AAAG, which Defendants have instead converted along with their stolen titles.

17.     AAAG accordingly requests that the Court order the return of all 43 vehicles that Defendants have converted or, in the alternative, order Defendants to pay AAAG the full value of the vehicles, worth approximately $2 million.

18.     AAAG also requests that the Court impose a constructive trust with the proceeds of Defendants' wrongful and illegal re-sale of the stolen title documents, to which AAAG has an equitable interest, in order to prevent Defendants' unjust enrichment.

19.     AAAG further requests that the Court freeze Defendants' assets and enjoin Defendants from further dissipating AAAG's property.

20.     AAAG also requests that the Court appoint a receiver for the purpose of entering, taking possession, managing, and protecting certain assets, including taking possession of and operating two automotive dealerships in Salt Lake City, Utah.

21.     AAAG finally requests that the Court grant AAAG any other relied that the Court deems just and proper.

## PARTIES, JURISDICTION, AND VENUE

22.     Plaintiff AAAG-California, LLC is a California limited liability company, which operates three auto dealer auction locations in Southern California.

23.     Defendant Abdul R. Kisana is the owner of Specialized Sales Leasing, LLC and Luxury Auto Group, LLC.  Upon information and belief, Kisana is a resident of Utah.

24.     Upon information and belief, Defendant Jack Metcalf is a resident of Utah and was at all relevant times an agent of Kisana and Specialized Sales and Leasing, LLC.

4

25.    Defendant Specialized Sales and Leasing, LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  At all relevant times, Specialized Leasing was owned by Kisana.

26.    Luxury Auto Group, LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  At all relevant times, Luxury Auto was owned by Kisana.

27.    This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds $75,000 and the parties are citizens of different states.

28.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants resides in the state in which this Court is located.

### GENERAL ALLEGATIONS

**A.    AAAG and Kisana Have Done Business Since 2018**

29.    AAAG is an auto auctioneer that operates out of three locations in Southern California.

30.    The auction location at issue is in Thousand Oaks, California ("Thousand Oaks Location").

31.    Although AAAG regularly pays the seller for the vehicle to be auctioned, the vehicle's title is only transferred from the seller to the auction's buyer upon AAAG's receipt of payment from the buyer.

32.    Depending on the frequency and magnitude with which an auto dealer purchases vehicles from AAAG's auctions, AAAG exercises the discretion to provide the dealer with a

5

privilege or "Trusted Status," through which it may process its payments to AAAG with greater flexibility.

33.    Dealers with Trusted Status may take possession of the vehicles, but the corresponding titles are never sent to any buyer until the buyer's final payment to AAAG has cleared.

34.    When a dealer with Trusted Status has an outstanding balance, an AAAG employee responsible for collections ("Collections Operations Assistant") contacts that dealer and arranges for payment.

35.    The Collections Operations Assistant is also responsible for sending the title to the dealer once a check has been deposited, payment has been logged in AAAG's system, and AAAG has confirmed that the dealer's payment cleared.  (AAAG Process Training Manual, "Issuing Out Titles", attached as Exhibit A).

36.    Again, a Collections Operations Assistant would only contact a dealer with Trusted Status to arrange for payment on vehicles that were outstanding and would only send titles once the payment process was complete.

37.    Kisana is an auto dealer based in Salt Lake City, Utah.

38.    Kisana owns two dealerships, Specialized Leasing and Luxury Auto, both of which are based in Utah.

39.    Kisana is a sophisticated dealer in the auto sales industry and has been in the business for almost ten years.

40.    Kisana is known by auctioneers for his purchase of large amounts of inventory and his expansive presence in the regional market.

6

41.     Kisana has also gained notoriety through advertising among professional athletes based in Salt Lake City, Utah, as well as with the Sundance Film Festival.

42.     Kisana first began purchasing vehicles from AAAG in early 2018, and, after cultivating a reputation of buying a significant amount of vehicles—and always paying off his balances—AAAG granted Kisana Trusted Status.

43.     In 2018, Kisana purchased and paid for $4,000,000.00 in total inventory from AAAG.

44.     In 2019, Kisana continued his pattern of large purchases, buying $4,000,000.00 in vehicles through August 24, 2019.

45.     As of August 25, 2019, Kisana had paid his outstanding balance and was authorized by AAAG to continue purchasing vehicles at auction.

**B.      Kisana Rapidly Accumulated a Significant Balance with AAAG**

46.     Between August 26, 2019 and October 31, 2019, Kisana bought 58 vehicles from AAAG.

47.     Throughout this time period, AAAG's Collections Operations Assistant Milagros Cossyleon Tapia ("Tapia" or "Mila") was in frequent contact with Kisana to arrange for his outstanding payments.

48.     Kisana allegedly informed Tapia that he needed more time to process payment because "money was tight," since he was apparently attempting to purchase an auto dealership franchise in Salt Lake City, Utah.

49.     Tapia informed AAAG management that Kisana had nevertheless assured her that he would soon pay his outstanding balance.

7

50.     In reality, Kisana did not process payment for any vehicles between August 26, 2019 and October 31, 2019, nor did he offer any financing arrangements.

51.     As of October 31, 2019, AAAG informed Kisana that he would be locked out of AAAG's auction system and would not be allowed to purchase any more vehicles until he had paid the outstanding sum of approximately $2 million remaining on his account.

52.     From October 31, 2019 until the year's end, AAAG's management instructed Tapia to regularly reach out to Kisana in order to determine when his payment would be forthcoming.

53.     Based on their frequent discussions, Tapia informed AAAG's management that Kisana was working on financing his purchases.

54.     Tapia never informed AAAG that Kisana had received title to any of the vehicles in question and, based on her experience as Collections Operations Assistant, knew that title would only be transferred once Kisana had paid his outstanding balance to AAAG.

**C.     Kisana Failed to Pay His Outstanding Balance of Approximately $2 Million**

55.     On December 20, 2019, AAAG reached out to Kisana to discuss when he would be sending payment and requested an in-person meeting to discuss his account.

56.     Kisana informed AAAG that he was going to be in Newport Beach, California with his family and would like to meet on December 21, 2019.

57.     When the AAAG managers reached out the next day, Kisana informed them that he had changed his plans and would not be available until the following day.

58.     On December 22, 2019, Kisana again did not show up to the meeting and became unresponsive to AAAG's repeated communications.

59.     Since Kisana had stopped responding to their messages, the AAAG managers decided to fly to Salt Lake City, Utah to visit him at his office at Specialized Leasing.

60.     On December 23, 2019, the AAAG managers contacted Kisana and asked when he would be at his office.  Kisana informed them that he would be available at 10:00 a.m. that morning.

61.     When the AAAG managers showed up at Specialized Leasing, they noticed that the front area of the dealership did not have any vehicles visible and that the location looked like it was not conducting retail sales.

62.     The AAAG managers then noticed that the dealership's back gate was open and saw several of the vehicles Kisana agreed to purchase at AAAG's auction—which Kisana had yet to pay for—on the lot.

63.     At approximately 10:00 a.m. on December 23, 2019, the AAAG managers contacted Kisana and informed him they were outside his dealership.

64.     Upon realizing that they were in Salt Lake City, Utah—and in fact standing outside of his dealership—Kisana invited them into his office.

65.     The AAAG managers provided Kisana with a list of vehicles for which payment was due and indicated that they would be willing to work with creditors to figure out how he could pay off the balance.

66.     Despite their good faith efforts, Kisana rejected their offer to negotiate.

67.     Instead, Kisana informed the AAAG managers that any lenders would need the titles to the vehicles in order to provide him with financing.

68.     Kisana then informed the AAAG managers that he had paid for the vehicles in question and that, if they continued to pursue him on this matter, he would call the Utah Department of Motor Vehicles ("DMV") to designate ownership based on who had possession of the vehicles.

69.     Kisana then claimed that, in Utah, if a consumer already had possession of the vehicle, as well as its title, ownership had already transferred—thus barring any claim for payment by AAAG.

70.     The AAAG managers informed Kisana that they remained in possession of the titles at issue because AAAG only transferred title to a buyer once AAAG had received full payment.

71.     The AAAG managers accordingly did not understand why Kisana had threatened to contact the Utah DMV, or how a consumer could possibly have title to a vehicle Kisana had agreed to purchase from AAAG.

72.     Kisana then contacted his attorney and, upon instruction from counsel, immediately ended the meeting and asked the AAAG managers to leave his office.

**D.     AAAG Discovers Kisana's Theft of the Vehicles' Titles**

73.     Upon their return to AAAG's Thousand Oaks Location, the AAAG managers asked the office manager to collect all titles for the relevant vehicles.

74.     When the office manager opened the safe where titles were kept until they were transferred to the buyer, she discovered that the titles were missing.

75.     On December 24, 2019, the AAAG managers held an all-staff meeting to ask if anyone had any information on either the missing titles or on Kisana's account.  No one provided any relevant information.

76.     The AAAG managers then interviewed each employee individually to provide them with an opportunity to relay potentially sensitive information.  Again, no one provided any relevant information.

77.     Among the employees interviewed was Tapia, who said that she had not had any recent conversations with Kisana, nor did she know anything about the missing titles.

78.     After interviewing all employees, the AAAG managers reached out to local law enforcement in Thousand Oaks, California and reported the missing titles.

79.     The AAAG managers then began to investigate their records to determine whether the titles had been misplaced at the Thousand Oaks Location.

80.     While searching through a shredder bin, the office manager found an auto history record for one of the titles that was printed by Tapia on the same date as the December 13, 2019 FedEx label.  (Exhibit B, Shred Document).

81.     The AAAG managers then reviewed their FedEx account to determine all packages that had been shipped from the Thousand Oaks Location to Salt Lake City, Utah.

82.     The AAAG managers found tracking numbers for four packages that had shipped from the Thousand Oaks Location, which had not been processed through AAAG's account and were instead ordered and payed for by a different account.  (Exhibit C, FedEx Log of Packages from Thousand Oaks Location).

83.     The four packages were shipped on the following dates:  December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019.  (Exhibit D, Copy of FedEx Shipping Labels; Exhibit E, FedEx Delivery Confirmation).

84.     By searching the tracking numbers, the AAAG managers determined that the four packages were sent by Tapia to Kisana.  (Exhibit D, Copy of FedEx Shipping Labels; Exhibit E, FedEx Delivery Confirmation).

85.     Through a review of AAAG's printer log, the AAAG managers found records that the four FedEx labels had been printed at the Thousand Oaks Location from Tapia's computer.

86.     The AAAG managers then reviewed video surveillance on December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019.

87.     The AAAG managers found surveillance footage on each date, in which Tapia printed packaging labels from her computer, retrieved titles from the safe, and then placed them in a FedEx envelope with the respective packaging slip.  (Exhibit F, Still Shots of the Relevant Video Surveillance).

88.     The AAAG managers also conducted a review of every title scanned in their servers.

89.     For one of the 58 vehicles in Kisana's possession, the AAAG managers found that its title had last been scanned on November 25, 2019.

90.     The AAAG managers accordingly reviewed video surveillance on that date and again witnessed Tapia print out a FedEx packaging label, insert a title into a FedEx envelope, place the packaging slip on the envelope, and then set the envelope out for shipment.

91.     In the video surveillance, Tapia is seen taking a photograph with her cellphone of the FedEx envelope with the packaging slip and then sending the photograph to an unknown contact.

92.     AAAG has provided copies of all of materials uncovered in its investigation to local law enforcement in Thousand Oaks, California as of December 30, 2019.

93.     Since December 24, 2019, Tapia has not returned to work.  Tapia has disconnected her cell phone number, as well as two email addresses that she had provided to AAAG.

94.     AAAG has since terminated Tapia's employment.

**E.     Defendants Have Attempted to Sell the Vehicles after Having Received Stolen Titles**

95.     In its review of FedEx packaging, AAAG determined that the five packages, shipped by Tapia on November 25, 2019, December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019, were accepted and signed for by Kisana, as well as Kisana's agent, Defendant Jack Metcalf.  (Exhibit E, FedEx Delivery Confirmation).

96.     At the end of December 2019, Defendants returned ten of the 58 vehicles to AAAG, leaving 48 in their possession or control.

97.     Then, once Plaintiff had initiated this litigation, Defendants returned another five vehicles to AAAG's Thousand Oaks location on January 21, 2020.

98.     Defendants have not returned the remaining 43 vehicles to AAAG.

99.     Defendants have since represented that one has been seized by a creditor, while Defendants have apparently sold the remaining 42 vehicles.

100.    DMV records show that Defendants have in fact already sold a significant number of the 43 vehicles to individual consumers, as well as to other dealerships around the country, fraudulently transferring the stolen titles in the process.  (Exhibit G, Selection of DMV Records).

101.    Upon information and belief, many of the 43 vehicles are listed either for sale or already sold from auto dealerships in Utah, California, Illinois, and North Carolina, among others.

13

102.   When Plaintiff's representatives contacted these dealerships, the owners claimed that they had purchased the vehicles with their title, and at the time, were led to believe that Defendants held an ownership interest in the property.

103.   Defendants have failed to provide any evidence that they have not retained possession of any of the 43 vehicles, let alone the proceeds from those sales.

104.   DMV records show that several of the stolen titles have been transferred along with the corresponding VIN numbers from the Vehicles for which Defendants have yet to pay.  (Exhibit G, Selection of DMV Records).

105.   Without the stolen title documents, Defendants would not have been able to re-sell the Vehicles, nor make any profit from their possession whatsoever.

106.   Upon information and belief, certain dealerships across the country have listed VIN numbers associated with the Vehicles, indicating that Defendants have continued to move, sell, and conceal the vehicles with their corresponding stolen titles.

107.   Indeed, Defendants have attempted to sell additional vehicles, which may include certain Vehicles they obtained from AAAG, to dealers across the country as recently as January 15, 2020, the day that Plaintiff initiated this litigation.

108.   Defendants owe AAAG $1,973,163.00 for the 43 vehicles that are outstanding.

109.   On January 3, 2020 AAAG managers spoke with Kisana's representatives, who offered to pay AAAG $390,000 in thirteen monthly installments.

110.   AAAG rejected Kisana's offer, which would only have paid a fraction of the $2 million outstanding.

111.    AAAG has filed this Complaint to recover the money that it is owed from the sale of 43 vehicles or, alternatively, to recover the vehicles and the titles that were stolen from its Thousand Oaks Location.

## COUNT I – CONVERSION

112.    AAAG incorporates by reference the allegations in paragraphs 1 through 111 of the Complaint.

113.    Conversion is willful interference with chattel performed without lawful justification.

114.    Conversion occurs when a person is deprived of using or possessing their property through the wrongful exercise of control by another.

115.    Until Defendants processed full payment for the 43 vehicles at issue, Defendants did not have an ownership interest nor any right to possession of the titles.

116.    Defendants caused the 43 titles to be wrongfully delivered by Tapia and accepted possession of them knowingly without having paid AAAG.

117.    AAAG has received no payment for any of the Vehicles, nor did AAAG ever authorize Defendants to have possession of the title documents.

118.    During the December 23, 2019 meeting with the AAAG managers, Kisana was aware that AAAG believed it was in possession of the titles, that it asserted its ownership of the titles, and that Defendants were in unlawful possession of the titles.

119.    Kisana nevertheless represented that AAAG would not be able to retrieve the vehicles unless it had physical possession of the titles, knowing at the time that Defendants were in possession of the stolen titles.

15

120.   Defendants sought to transfer the title documents to unwitting consumers and other dealers in an effort to dissipate, devalue, and conceal AAAG's property to purposely frustrate any attempt at returning the property.

121.   Defendants have converted the title documents and AAAG demands the immediate return of its property.

### COUNT II – FRAUD IN TRANSFERRING STOLEN TITLE DOCUMENTS

122.   AAAG incorporates by reference the allegations in paragraphs 1 through 121 of the Complaint.

123.   Defendants had represented to AAAG that they were in the process of expansion, and that money was tight while they expanded operations, which was the reason for delayed payment, but that they would pay for the Vehicles they promised to purchase.

124.   Defendants represented that they were financially able to expand and that they had capital for expansion.

125.   On December 20, 2019, Defendants discussed payment and agreed to an in-person meeting to discuss his account in Newport Beach, California, where Kisana would be with his family.

126.   Kisana agreed to meet AAAG's representatives on December 21, 2019 to discuss processing payment for the vehicles that Defendants had acquired from AAAG.

127.   The following day, Kisana informed AAAG that he had changed his plans and would not be available until the following day.  Kisana again did not show up to the arranged meeting.

16

128.    On December 23, 2019, AAAG traveled to Salt Lake City, Utah to discuss payment and financing with Defendants.

129.    Kisana did not admit that Defendants had been reselling vehicles and titles acquired from AAAG, and were thereby depriving Plaintiff of its property and rights to proceeds.

130.    Kisana instead continued to make misrepresentations so that Defendants could continue a scheme of dissipating, devaluing, and concealing the property they converted from AAAG, the assets from the wrongful re-sales of that property, and the evidence of both the sale and proceeds.

131.    While representing to AAAG that they were working on financing and producing payment, Defendants had actually worked with a now-former employee of AAAG to wrongfully send them title documents to the vehicles without Defendants processing payment.

132.    Defendants subsequently used those stolen titles to represent that they had valid and unencumbered titles to the vehicles to consumers and other dealers in order to cause the sale of the vehicles and wrongfully transfer title.

133.    Defendants transferred title in order to unjustly profit from the stolen property and to cause the dissipation or concealment of AAAG's property so that AAAG would be unable to recover the stolen titles at issue.

134.    AAAG was injured by Defendants' misrepresentations through the loss of its property, the dissipation in value of its property, and the impairment of its right to recovery.

## COUNT III – UNJUST ENRICHMENT FROM THE VEHICLES

135.    AAAG incorporates by reference the allegations in paragraphs 1 through 134 of the Complaint.

136.    Under Utah law, unjust enrichment occurs when: (i) a benefit is conferred on one person by another; (ii) the conferee appreciates and/or has knowledge of the benefit; and (iii) the conferee accepts or retains the benefit under circumstances that make it inequitable for the conferee to retain the benefit without payment of its value. *Kimball v. Kimball*, 217 P.3d 733, 747 (Utah Ct. App. 2009).

137.    Unjust enrichment occurs when the moving party has an "equitable interest" in the property it seeks a constructive trust in order to preserve. *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 600 (Utah 1983).

138.    Unjust enrichment is "a flexible and workable doctrine," and district courts are afforded "broad discretion" in its application. *Jeffs v. Stubbs*, 970 P.2d 1234, 1245 (Utah 1998).

139.    Defendants were afforded the benefit of Trusted Status with AAAG, which allowed them to take possession of the vehicles prior to final payment.   This benefit would allow Defendants to advertise the vehicles to consumers throughout the country.

140.    Defendants would not be able to finalize any sale of the vehicles to third parties, even with Trusted Status, without clearing final payment with AAAG, since they did not have the title documents for the vehicles and would not under any circumstances be authorized to receive them without processing final payment.

141.    By retaining possession of the vehicles reselling them, Defendants were unjustly enriched.

18

## COUNT IV – UNJUST ENRICHMENT FROM THE STOLEN TITLES

142.    AAAG incorporates by reference the allegations in paragraphs 1 through 141 of the Complaint.

143.    A benefit was wrongfully conferred on Defendants when AAAG's now-former employee sent them title documents, despite the fact that Defendants had yet to process payment for the vehicles in question.

144.    Defendants were aware of the benefit conferred on them upon Defendants' receipt of the stolen title documents, the delivery of which Kisana and Metcalf accepted.

145.    Defendants knew that they had neither paid for the titles nor were they authorized to receive them.

146.    Defendants were unjustly enriched by the continued possession of the stolen title documents, which they then resold to consumers, along with the respective vehicles, despite not having paid Plaintiff for them.

147.    Defendants re-sold the vehicles and titles at a higher price than the value assessed by AAAG.

148.    Defendants profited from their egregiously wrongful conduct and will keep that profit even if the vehicles or their original value are returned to AAAG.

149.    AAAG has an equitable interest in the proceeds from the apparent sale of the vehicles because, without Plaintiff's stolen property, the sales never would have occurred.

150.    Defendants were unjustly enriched by their fraudulent re-sale of vehicles to consumers at a marked up price, and no legal remedy will prevent that unjust enrichment.

19

## <u>COUNT V – CONSTRUCTIVE TRUST</u>

151.    AAAG incorporates by reference the allegations in paragraphs 1 through 150 of the Complaint.

152.    A constructive trust is proper under Utah law when: (1) there is a wrongful act; (2) the party against whom constructive trust is sought has been unjustly enriched, and (3) specific property can be traced to the wrongful behavior. *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 361-62 (Utah 2007).

153.    A wrongful act is established by facts evidencing that an entity must have received funds by mistake or participated in active or egregious conduct.

154.    A constructive trust may arise where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Parks v. Zions First National Bank*, 673 P.2d 590 (Utah 1983).

155.    Constructive trusts are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another.

156.    A constructive trust is an available remedy even in cases where a plaintiff might assert alternative legal theories to support imposition of a constructive trust. *Rawlings v. Rawlings*, 2010 UT 52, ¶ 30, 240 P.3d 754, 763.

157.    Defendants caused title documents to be removed from AAAG's Thousand Oaks Location while working in secret with Plaintiff's now-former employee, and accepted delivery of the stolen title documents.

158.    Defendants fraudulently represented that they had the right to those title documents to consumers throughout the country.

159. Defendants then used the stolen title documents to re-sell the vehicles and stolen title documents, a sale of which would not have otherwise been possible absent Defendants wrongful possession of the titles.

160. Defendants wrongfully obtained a benefit, through the illegal delivery of title documents from a former AAAG employee, which they knowingly accepted, and subsequently converted specific and identifiable property of AAAG into traceable funds.

161. Defendants were unjustly enriched by their possession of the stolen title documents and have profited from their illegal resale.

162. AAAG requests that the Court impose a constructive trust, at the discretion and management of the Court-appointed Receiver, in order to preserve this wrongfully-obtained property and the proceeds procured from the transfer of this property, which Plaintiff has an equitable right thereto.

163. "An equitable lien is a creature of equity, is based on the equitable doctrine of unjust enrichment, and is the right to have a fund or specific property applied to the payment of a particular debt." *Caldwell v. Armstrong*, 342 F.2d 485, 490 10th Cir. 1965).

164. AAAG has an equitable lien on the proceeds from the re-sale of the property stolen from Plaintiff, as Defendants would otherwise be unjustly enriched, and this fund should be applied to the payment of the original debt owed on the vehicles.

165. AAAG has a right to the vehicles, the respective titles, and an equitable right to the proceeds obtained through the re-sale of their property.

166. A constructive trust is necessary to trace its property and any proceeds received by Defendants following their wrongful sale to consumers throughout the country.

## COUNT VI – PRELIMINARY INJUNCTION

167.    AAAG incorporates by reference the allegations in paragraphs 1 through 166 of the Complaint.

168.    As noted in the Motion filed with the Complaint, to obtain a preliminary injunction, a party must establish: "1) a substantial likelihood of success on the merits of the case; 2) irreparable injury to the movant if the preliminary injunction is denied; 3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and 4) the injunction is not adverse to the public interest." *Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004); *see also Klein-Becker USA, LLC v. Product Quest Mfg., Inc.*, 429 F. Supp. 2d 1248 (D. Utah 2005).

169.    AAAG requests a Preliminary Injunction freezing Defendants' assets pending an accounting by a Court-appointed Receiver and enjoining Defendants from selling, transferring, or in any way disposing of any of the vehicles or stolen titles, as well as any and all documents, communications, and any other evidence concerning the vehicles.

170.    Defendants have already attempted to sell the vehicles with the stolen titles, which impairs AAAG's ability to recover its stolen property, and continues a scheme to fraudulently sell the vehicles with stolen title.

171.    Defendants will accordingly continue to sell these vehicles to the unsuspecting public and subsequently conceal any profits received following their sale, if not enjoined from doing so.

172.    Because Defendants have already taken action to hide their assets and avoid collections on this sale, freezing Defendants' assets is necessary to preserve the proceeds from the

wrongful sale of the vehicles and to prevent the mismanagement and potential insolvency of Defendants.

173.    Defendants have continued to conceal relevant evidence, even after notice of these claims.  For example, Defendants have taken down the website for Specialized Leasing as of January 24, 2020—despite the Court's January 23, 2020 issuance of a Temporary Restraining Order—and even after having received notice from AAAG's counsel on January 27, 2020.

174.    Without an injunction, Defendants will likely transfer their assets to a different entity in order to avoid any judgment and will continue to sell AAAG's property to the unsuspecting public.

175.    AAAG will succeed on the merits of the case, and would suffer irreparable injury in the loss, dissipation, or concealment of its property and necessary, relevant, and material evidence.

176.    The threatened injury to AAAG outweighs the injury to Defendants, because the injunctive relief would prevent further fraud, concealment of evidence, and further injury to AAAG, Defendants can only claim that injunctive relief may stall their (illegitimate) expansion into the local auto market.

177.    The imposition of a preliminary injunction is in the public interest to protect unsuspecting consumers and other auto dealers from being the victim of a fraudulent transfer of title.

## COUNT VII – REQUEST FOR RECEIVER

178.    AAAG incorporates by reference the allegations in paragraphs 1 through 177 of the Complaint.

179.    Fed. R. Civ. P. 66 recognizes and governs an action in which a receiver is appointed.

180.    Fed. R. Civ. P. 66 provides that the receivership should "accord with the historical practice in federal courts or with a local rule."

181.    The factors for considering the appointment of a receiver under Fed R. Civ. P. 66 include: "(1) the validity of the claim of the party seeking a receiver; (2) the probability that fraudulent conduct has occurred or will occur to frustrate that claim; (3) imminent danger that property will be concealed, lost, or diminished in value; (4) inadequacy of legal remedies; (5) lack of less drastic remedy; and (6) the likelihood that appointing a receiver will do more harm than good." *EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, No. 2:09CV523DAK, 2018 WL 5776545 (D. Utah) (citing Fed. R. Civ. P. 66).

182.    The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles. *EarthGrains Baking*, 2018 WL (*citing World Fuel Servs. Corp. v. Moorehead*, 229 F. Supp. 2d 584, 596 (N.D. Tex. 2002).

183.    There is significant reason to fear Defendants' insolvency; the fraudulent concealment of their assets; and the dissipation, loss, or concealment of AAAG's property that is in their possession.

184.    There is a significant risk to the loss, destruction, or concealment of important evidence that is necessary in AAAG's prosecution of its claims.

24

185.   A neutral party is accordingly necessary in the pendency of this litigation to ensure that the property is not lost and that evidence is not squandered, concealed, or destroyed.

186.   AAAG requests this Court to appoint a receiver to oversee an order freezing Defendants' assets and enjoining them from the further sale of the vehicles.

## COUNT VIII – FRAUDULENT INDUCEMENT

187.   AAAG incorporates by reference the allegations in paragraphs 1 through 186 of the Complaint.

188.   "Traditionally, a person who has been fraudulently induced to enter into a contract has either of two remedies; he could rescind the transaction tendering back what he has received and sue for what he has parted with or, he may affirm the transaction and maintain an action in deceit ... Rescission based on fraudulent inducement is, of course, an equitable remedy." *Mecham v. Benson*, 590 P.2d 304, 308 (Utah 1979).

189.   AAAG extended Trusted Status to Defendants allowing them to take possession on the condition of later payment.  This status was based on Defendants' representations that they would pay and always intended to pay for the vehicles.  Defendants' misrepresented their financial status, as well as their ability and intention to pay for the Vehicles.

190.   AAAG took due diligence in affirming Defendants' history of payment and reputation.

191.   Defendants were aware that payment would not be forthcoming when they agreed to purchase the Vehicles and took advantage of their Trusted Status.

192.   Payment on the vehicles was a material term and obligation under the sales contract between AAAG and Defendants.  Had AAAG been aware that Defendants could not and did not

plan to make payment, AAAG would never have sold the vehicles to Defendants, or more importantly, would never have extended the contractual benefit of possession of the vehicles for advertising purposes.

193.   A contract as a Trusted Dealer would never have been extended to Defendants without their misrepresentations, which Defendants were aware of.

194.   Defendants represented that they were arranging payment for AAAG on the vehicles that they agreed to purchase from the Thousand Oaks Location and that Defendants were in a financial position to make payment.

195.   Defendants' representation of financial viability and intent to pay were false. Defendants did not use flooring lenders like they did in the past to make payments, and did not deliver checks as they had also done in the past.  Indeed, Defendants did not have either the ability or the intent to pay at the time of purchase.

196.   Defendants were aware that they were making misrepresentations to AAAG. Multiple contacts were made to Defendants for payment.   Defendants repeatedly informed AAAG's employee that they intended to pay and would work with AAAG to rectify their account. These statements were clearly false.

197.   Defendants made their financial representations in order to cause AAAG to allow them to purchase vehicles again and later to lift the restriction on purchasing.  AAAG would not have extended Trusted Status to Defendants had they known of the falsity of their statements, nor would they have sold the vehicles in question.

198.   Because of the misrepresentations, AAAG is injured in the amount of approximately $2 million as well as the loss and fraudulent transfer of its vehicles.

199.    AAAG requests that the Court find that AAAG was fraudulently induced into a Trusted Dealer contract for the purchase of the vehicles, and respectfully requests that the Court equitably rescind the contract to return the parties to the status quo before this fraudulently induced contract, and to order the return of the vehicles, which Defendants took possession of under the premise of the fraudulently induced contract.

## COUNT IX – BREACH OF CONTRACT

200.    AAAG incorporates by reference the allegations in paragraphs 1 through 199 of the Complaint.

201.    If the Court does not grant rescission of the contract for the purchase of vehicles, AAAG alleges that Defendants breached their contract by failing to pay for the vehicles after taking possession of them.

202.    AAAG and Defendants had an enforceable contract, through which Kisana agreed to purchase all vehicles for the price determined at auction. *See* Exhibit H (Contracts)[1].

203.    Defendants have failed to satisfy their obligations, pursuant to the terms of their agreements.

204.    Defendants' failure to perform by providing AAAG with payment, at the price agreed upon, constitutes a breach of the contract.

205.    AAAG and Defendants had a valid contract to purchase vehicles and deliver titles when payment was made.

---

[1]    Exhibit H, (Contracts), is an example of one of the contracts from the many sales to Specialized Leasing.  The original seller information was not included to protect personal information.

206.    AAAG and Defendants are both sophisticated businesses, acquainted with the industry and in the sale of vehicles.  All parties are considered merchants in the auto sales industry.

207.    A material term of the contract was that Defendants deliver payment for the vehicles they agreed to purchase before title would be released.

208.    AAAG performed all of its obligations under the contract.

209.    Defendants did not pay the $1,973,163.00 outstanding, and therefore has materially breached the terms of the parties' agreement.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A.    That the Court rescind the parties' contract for the purchase of the vehicles and order the Defendants to return the vehicles, as well as any benefit they received under the contract;

B.    In the alternative to rescission, that the Court find that Defendants breached their contract and enter judgment against Defendants for the amount of $1,973,163.00;

C.    That Defendants be ordered to return the stolen title documents to AAAG;

D.    That the Court grant AAAG an equitable lien on the proceeds from Defendants wrongful and illegal sale of AAAG's title documents;

E.    That the Court form a constructive trust to preserve AAAG's property in the stolen title documents and the proceeds wrongfully obtained through their fraudulent transfer;

F.    That the Court enter a Preliminary Injunction against the Defendants freezing their assets and enjoining them from selling, dissipating, or otherwise transferring any of the remaining vehicles, title documents, or proceeds derived from their wrongful sale;

G.     That the Court appoint a Receiver to facilitate the freeze of Defendants' assets and the return of the property that was fraudulently induced and continues to be concealed;

H.     That the Court empower the Receiver to form a constructive trust in order to protect Plaintiff's property; and

I.     For such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff AAAG hereby demands a trial by jury on all claims so triable.

Dated:  February 4, 2020                                    Respectfully submitted,

                                                            /s/ Jess M. Krannich
                                                            Jess M. Krannich (Utah Bar No. 14398)
                                                            MANNING CURTIS BRADSHAW &
                                                            BEDNAR PLLC
                                                            136 East South Temple, Suite 1300
                                                            Salt Lake City, UT 84111-1180
                                                            Tel: (801) 303-0034
                                                            Fax: (801) 364-5678
                                                            jkrannich@mc2b.com

                                                            Gabriel E. Bedoya (*Pro Hac Vice*)
                                                            HONIGMAN LLP
                                                            660 Woodward Avenue
                                                            2290 First National Building
                                                            Detroit, MI 48226-3506
                                                            Tel: (313) 465-7254
                                                            gbedoya@honigman.com

                                                            *Attorneys for Plaintiff AAAG-California,*
                                                            *LLC*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of February, 2020, the undersigned electronically transmitted the foregoing **FIRST AMENDED COMPLAINT AND JURY DEMAND** to the Clerk's Office for the United States District Court for the District of Utah using the District Court's CM/ECF System, which shall electronically serve a copy of the foregoing upon counsel of record for all parties in the above-captioned case.

/s/ Jess M. Krannich

## Index of Exhibits for *AAAG-California, LLC v. Abdul Kisana, et al.*

| Exhibit | Document | ¶¶ |
|---|---|---|
| A | AAAG Process Training Manual, "Issuing Out Titles" | 32 |
| B | Shred Document | 79 |
| C | FedEx Log of Packages from Thousand Oaks Location | 81 |
| D | Copy of FedEx Shipping Labels | 82, 83 |
| E | FedEx Delivery Confirmation | 82, 83, 94, 130 |
| F | Still Shots of the Relevant Video Surveillance | 86 |
| G | Selection of DMV Records | 95, 98 |
| H | Contracts | 106 |
| I | VIN Report of All Vehicles Sold | 153 |